[Crim. No. 11482. Second Dist., Div. One. Apr. 26, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN EDWARD JENKINS, Defendant and Appellant.

Rudolph Pacht, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J. — In an information the defendant was charged in count 1 with murder of Leon Williams, and in count 2 with assault with a deadly weapon on William Johnson. In a jury trial he was convicted of manslaughter on count 1, and of assault with a deadly weapon on count 2. The judgment was reversed on the ground that the jury had not been instructed properly regarding justifiable homicide. (*People* v. *Jenkins,* 232 Cal.App.2d 323 [42 Cal.Rptr. 654].)

Thereafter, an amended information was filed charging the defendant in count 1 with manslaughter of Leon Williams, and in count 2 with assault with a deadly weapon on William Johnson. He denied an allegation that he had been convicted previously, in Missouri, of assault with intent to kill with malice, a felony, and that he had served a term in prison therefor. He waived a trial by jury as to the allegation of prior conviction. The trial judge found that allegation to be true. The jury found the defendant guilty of manslaughter (count 1), and not guilty of assault with a deadly weapon (count 2). He was sentenced to imprisonment in state prison. He appeals from the judgment.

Appellant contends that the evidence was insufficient to support the verdict or to support the finding that the allegation as to prior felony conviction was true. He also contends that he was denied due process of law by the admission of evidence that he had been convicted previously of a felony; that he was denied a fair trial by misconduct of the deputy district attorney; and that the court erred in receiving in evidence a statement made by defendant to the police.

On April 24, 1963, and for several weeks prior thereto, defendant Jenkins, about 24 years of age, and Margaret Nixon, about 18 years of age, were living together in an apartment-court in Los Angeles. Before living there with the defendant, she had lived there with Harry Cravens and his parents.

On said April 24, about 7 p.m., when Cravens went to the apartment, the defendant Jenkins and Margaret Nixon were there. At that time, or within approximately an hour thereafter, five other men, most of whom were uninvited by or unknown to defendant or Margaret came into the apartment. Those men were Leon Williams (victim) who lived in another apartment in that apartment-court, Johnson, Oatis, Washington, and Crowley. During the first part of that meeting or party, the activities consisted of dancing, listening to records, conversation, and drinking alcoholic liquor. After a while Johnson left the party and returned with some Vodka and beer, which beverages were then consumed by those present. Some of those persons had been drinking alcoholic liquor before they arrived at the apartment. About 9 p.m., Williams (victim), Oatis, and Johnson became sick and vomited. Williams vomited on the floor of the living room and on the floor from the dining area to the bathroom. Also, Williams had thrown some cigarette butts on the floor. Margaret told Williams to clean up the mess. Williams replied to the effect that he was going to go home first, to change his shirt. (As above stated, he lived in a nearby apartment.) Margaret and Williams continued to argue or discuss the matter of Williams' cleaning the floor. As a result of the conduct of Williams and of some of the other alleged "guests," the defendant directed all of them to leave the apartment, and (according to his testimony) they did not pay any attention to him. Also, according to defendant's testimony, he observed that Johnson had taken possession of defendant's sun glasses. By this time a general quarrel had developed, and soon thereafter fighting commenced and Williams was killed by knife stabbing.

Washington, called as a witness by the prosecution, testified in part that while he was entering the kitchen he heard Margaret and Williams "having some words" and arguing while they were at the front door; when he (witness) was returning to the living room, he saw defendant and Williams at the front door and they were arguing and "having words"; at that time Margaret was about 10 or 15 feet from them—she was in the back by a wall bed (a pull-down bed, which was down at that time); there was a little scuffle, and the defend-

ant struck Williams with his hand; there were rapid movements of defendant's hands; Johnson ran to the front door; Williams was then in the corner by the door and against the wall—he was in a bent forward or slumped position and was going down slightly; the defendant and Johnson were struggling, near the wall bed which was close to the door, and Johnson had his hands around the wrists of the defendant, who had a knife in his hands. Defendant cut Johnson on the nose. Williams never got up from his position in the corner.

Cravens, called as a witness by the prosecution, testified in part that he arrived at the apartment about 7 p.m. on said day; the persons who were there, except the defendant Jenkins, Margaret, and Crowley, drank wine and Vodka; while he was sitting at a table in the dining area, about 20 feet from the front door, he heard the sound of breaking glass in the front room, and then "everything happened"; he then saw Johnson and "some boys" pushing the defendant Jenkins on the bed; Johnson was grabbing the defendant and pushing him onto the bed; he (witness) started running toward the front when he saw Johnson raise his hand; he grabbed Johnson and threw him against the wall; then he (witness) "got" the defendant, who got up, ran behind the witness (Cravens), and went out the door; then he (witness) saw Williams, on his knees in a crumpled position beside the bed, bleeding from his back; the witness and Crowley picked Williams up and "started carrying him out the door"; when they got him about halfway to the street (halfway from house to street) he fell, and they did not move him again; and the police came soon thereafter; Cravens (witness) did not see a knife in the hands of Williams or Johnson.

Margaret Nixon's testimony given at the preliminary examination was read to the jury by the prosecution,—the trial judge having ruled to the effect that the prosecution had presented sufficient evidence to establish that she could not with due diligence be found within the state. Her testimony, in part, was as follows: Williams was drunk when he came into the apartment and he drank Vodka and ale while he was there. She knew him and the four other persons, who were there as uninvited visitors. After they had been there a short while and were continuing to drink, the defendant told all of them to leave the house, but they did not pay any attention to him. Later, Williams vomited all over the place. The defendant told Margaret that Williams had thrown up in the bathroom. When he came from the bathroom and was on his way

out of the house, she stepped toward the front door, stopped him, and told him to clean up the mess. Williams replied that he was going home first, to change his shirt. She kept arguing and telling him to clean the floor. He hit her and pushed her against the wall. Then the defendant ''gets into it,'' and he and Williams were fighting and wrestling on the bed, and defendant started cutting Williams with a knife. She tried to pull defendant off of Williams. Johnson told Margaret to leave the defendant alone and to go away and sit down. When she told Johnson that this was not his affair, he hit her on the lip.

It was stipulated that Margaret's testimony given at the first trial might be read to the jury. Her testimony at the first trial was substantially the same as her testimony at the preliminary examination, except that at the first trial she said that on the morning of April 24 (day of the fight) she had been to a pool hall, where she saw some of the boys who came to her home in the evening of that day.

During the fight in the house, Williams was stabbed five times with a knife, and he died within a few minutes thereafter.

After the fight the defendant ran out of the house, went to the home of his friend Charles Seward and told him what had happened. Seward went to the defendant's house and returned soon, stating that the man was dead. Then the defendant shaved off his moustache and beard. After the defendant had talked with his father and Seward, they took him to the police station where he turned himself ''in'' to the police about 12:30 a.m. on April 25, 1963. Officer Guzy testified that at that time the defendant said, ''I come to clean up the cutting.''

Officer Sandoval testified that about 12:40 a.m. on that day he had a conversation with defendant at the police station, and that immediately thereafter he reduced the conversation to a written statement which the defendant read and signed. It was stipulated by the defendant and by his trial counsel that there was no objection to the use of that statement at the rial. The statement was in substance as follows: ''I started drinking . . . beer about 9 a.m. and have been drinking all day long. This evening me, Margaret, and a cat named Jaws were in my pad. Jaws is an entertainer and he and I were tap dancing. There was a knock on the door and Margaret . . . answered the door. Three studs came in. They were friends of Margaret and I did not know them. I think they were Low

Riders or Junior Flips. . . . I was trying to get a job with this entertainer so I continued dancing and talking business. . . . About 10 minutes later . . . 2 or 3 more cats came in. One of them went back out and got a pint of Vodka and a quart of Busch Bavarian. . . . By now the cats were going all through my house. . . . [T]his cat goes into the bathroom and goes all over the floor, then he throws cigarette butts and matches all over my pad and I don't even smoke myself. This other cat is sitting in the dining area when he starts to vomit and vomits all the way . . . to the bathroom. This is when I told them all to leave. Then I caught another cat trying to steal a $2.00 pair of sun glasses. Margaret then told them all to leave but they ignored her so I went to the door and told them all to get out. Then this stud jumped in front of me and slammed the door shut. He said, 'I am not going to leave' and grabbed me. That's when I hit him with my fist. He fell backward and broke the door. Then he jumped up and he grabbed me again and we fell back on the bed. Earlier I had been trimming my corns and I had left a knife lying on the bed. When we fell on the bed I felt that he was going to beat me up pretty bad so I grabbed the knife and opened it. . . . He was on top of me and I stabbed him. I don't know how many times I stabbed him but I kept swinging the knife. Then a bunch of other guys started after me and I just kept stabbing at all of them. I'm almost sure I cut 5 or 6 of the others because I just kept slashing at them with a knife until I got near the back door. Then this stud . . . grabbed the knife from me and tried to stab me. I was cut on my right hand. . . . After this stud took the knife away from me, I ran out the back door and jumped over the fence. I ran down . . . to Charles Seward's house. . . . I told Charles what happened and he went back to my pad to see what was happening. When he came back he told me the guy was dead. While I was at Charles Seward's house I shaved my moustache and goatee because I was not going to come back. Charles and my father talked me into coming in and giving myself up. The knife that I used to stab him with is too big for me to carry so I don't carry it. If I did I know I would get arrested for sure. I am telling you this because I want to help you clear up this matter. You have not threatened me, or forced me or promised me anything for making this statement. I do it freely and voluntarily.''

Defendant testified, in part, as follows: On said April 24, about 7 p.m., while he, Margaret, and an entertainer by the

name of Iron Jaws were in the house, five men who were acquaintances of Margaret came there. After there had been drinking of alcoholic liquor in the house, one of the men changed a record on the hi-fi, and the defendant told Margaret to ask her friends to leave the house. Soon thereafter, Cravens (who previously had lived with Margaret) came there, and since the defendant thought there was going to be come confusion because Cravens was present, he (defendant) asked the five men to leave the house. Johnson was vomiting on the bedroom floor and also throwing cigarette butts on the floor. While Johnson was bending over to pick up a cigarette butt, the defendant's sun glasses fell out of Johnson's shirt pocket. Williams vomited all over the living-room floor. After the defendant again had told the men to leave, he escorted Johnson and Williams to the front door. At that time Margaret, who was near the door, was arguing about cleaning up the mess. Defendant told her to "forget about it" and just get them out of the house. Defendant opened the door and asked them to leave. Johnson or Williams slammed the door, and Williams struck Margaret with his fist and threw her toward the wall. Defendant pushed her onto the bed and then struck Williams in the face, and Williams fell against Johnson who then fell against the front door and broke the glass therein. Then both of them (Johnson and Williams) came back fighting the defendant and pushing him onto the bed. They fell on top of him, and Williams began choking him with the tie which defendant was wearing. Defendant's left arm was pinned down and blood was on his face. Other persons were "piling" on top of him or on top of the persons who were on him. He could not see who was swinging the blows toward his face, or see how many persons were swinging blows. With all those persons and that weight on top of him, he panicked. He remembered that earlier in the evening he had left his coat on the bed and had left his pocket knife under his coat. He slipped his hand under the coat, opened the knife with one hand, and started stabbing the crowd with the knife. He was not directing the knife at any particular person, but while he was swinging the "knife up in the air" the knife disappeared, and then he began kicking and he kicked until he was free from the crowd. He ran out the door, jumped over the back fence, and went to Seward's house. While he was at that house he shaved off his moustache and beard because he was frustrated—he was afraid the police or those men would get him, and he was thinking of fleeing. His

father came there and told him that the best thing to do was to turn himself ''in.'' His father and Seward took him to the police station and he turned himself ''in'' to the police. He had been convicted of a felony in 1958 in the circuit court in St. Louis—convicted of assault with intent to commit murder and he was sent to the reformatory in Missouri.

 Appellant contends that the evidence was insufficient to support the finding that he had been convicted previously of a felony, and that he had served a term in prison therefor. He argues to the effect that the prior offense was not a felony and that he had not served a term in state prison in that the place where he was imprisoned in Missouri was not a state prison but was a reformatory for youth. The prior offense was assault with intent to kill with malice. That offense, according to the law of Missouri, is a felony (*State* v. *Green*, 66 Mo. 631, 647-648; *State* v. *Wilson*, 140 Mo. App. 726 [126 S.W. 996]), and the punishment therefor, as provided by statute, is imprisonment in the penitentiary. (There is no alternative provision for punishment by imprisonment in the county jail.) Also, according to Missouri law, if a person is convicted of an offense which is declared by statute to be a felony, he is convicted of a felony regardless of the punishment prescribed by statute or the punishment specified in the sentence. (See *State* ex rel. *Sanks* v. *Johnson*, 138 Mo. App. 306 [121 S.W. 780].) In Missouri a department of state government is ''A Department of Corrections,'' and the ''scope and purpose of the department is to supervise and manage the penal, correctional and reformatory institutions of the state . . . .'' (Vernon's Ann. Mo. Stats., Vol. 12A, § 216.010, p. 305.) A reformatory in Missouri is an institution within the Department of Corrections. The Revised Statutes of Missouri, in effect when the defendant Jenkins was sentenced in 1958, provided: ''An intermediate reformatory for young men, who for the first time have been convicted of a felony as hereinafter designated, is hereby established.'' Vernon's Ann. Mo. Stats., Vol. 12A, § 217.730; see annotation in said statutes under § 216.370, p. 364.) In the present case, the evidence was sufficient to support the finding that defendant Jenkins had been convicted previously of a felony and that he had served a term in prison therefor.

 Appellant contends that he was denied due process of law and denied a fair trial in that the court permitted the prosecution to introduce evidence that appellant had been convicted previously of a felony. He argues that, even though

such evidence was offered for the purpose of alleged impeachment of appellant as a witness, the alleged prior felony, which was a crime of violence (assault with intent to kill), would not tend to prove dishonesty or lack of veracity of appellant. Section 2051 of the Code of Civil Procedure provides, in part: ''A witness may be impeached by the party against whom he was called, by contradictory evidence or by evidence that his general reputation for truth, honesty, or integrity is bad, but not by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony. . . .'' In *People* v. *Williams*, 27 Cal.2d 220, 228 [163 P.2d 692], it was said: ''In this state the testimony of a witness may be impeached by proof that he has suffered a prior conviction of a felony. [Citation.] This rule applies to a defendant who testifies in his own behalf in a criminal trial despite the fact that such evidence may tend to prejudice him in the eyes of the jury. [Citations.] The nature of the crime of which he was convicted is a proper subject of inquiry in establishing the fact of his conviction.'' In *People* v. *Brown*, 222 Cal.App.2d 739, 742 [35 Cal.Rptr. 582] it was said: ''It is well established that a defendant who chooses to take the witness stand in a criminal action thereby subjects himself to impeachment by proof of a prior felony conviction.'' In the present case, the appellant brought up the matter of prior conviction—he was asked on direct examination whether he had been convicted of a felony. He replied in the affirmative. On cross-examination he was asked whether he had been convicted of a felony. He replied in the affirmative. Then on cross-examination he was asked, ''What felony?'' He replied that he had been convicted of assault with intent to commit murder, when he was a juvenile, and he was sent to the reformatory in Missouri. The trial court, in the present case, did not err in receiving evidence that appellant had been convicted previously of a felony. ▮ Appellant asserts further that said section 2051 of the Code of Civil Procedure is unconstitutional. In *People* v. *Stewart*, 240 Cal.App.2d 1, 6-7 [50 Cal. Rptr. 26], a similar contention was made. It was said therein (p. 7) : ''Admission of evidence of a prior conviction for the purpose of impeachment pursuant to section 2051, Code of Civil Procedure, has been upheld in innumerable decisions in California for almost the past century.'' This contention with regard to asserted unconstitutionality of section 2051 is not sustainable.

■ Appellant also asserts that he was denied a fair trial in that the deputy district attorney was guilty of misconduct in asking leading and highly inflammatory questions. Johnson, who was called as a witness by the prosecution, was asked various questions by the deputy, and his answers thereto were nonresponsive or were to the effect that he did not know, he did not remember, it might have been, or might not have been. He also stated, with respect to several questions, that he declined to answer on the ground that his answers would tend to incriminate him. The deputy asked whether Johnson saw Williams stabbed. He answered: "I haven't seen no knife. I didn't see nobody get stabbed." The deputy asked whether Johnson saw the defendant kick Williams and then pull a pocket knife out of his right pocket and start stabbing Williams. Counsel for defendant objected to the question as "highly prejudicial and inflammatory." The objection was sustained. Appellant asserts that since there was no evidence that he pulled a knife out of his pocket, the only conclusion to be drawn from the question is that the deputy acted in bad faith, and that the jury was influenced by such misconduct. It is apparent that the deputy was questioning a hostile witness, who surprised the deputy by his many answers to the effect that he did not remember or that his answers would tend to incriminate him. The witness had said that his memory was completely exhausted with respect to anything involving the defendant and Williams. He had testified at the previous trial, but when he was asked whether he had testified at that trial, he said that he may have but he did not know. When he was asked to tell what he remembered with reference to the matter involving defendant and Williams, he said: "[W]hat I remember is so mixed with truth and untruth that I can't distinguish where truth began and untruth stopped." The deputy district attorney, in attempting to refresh the witness' recollection, directed Johnson's attention to three pages of the reporter's transcript of the prior trial and asked whether Johnson's reading of that refreshed his recollection. He replied: "No, it don't do nothing for me, just like another book I have read, just sounds like . . . it might be something in my mind but I can't bring it out." He also said: "I have been reading fiction books and that is all I got in my mind." After the objection had been sustained to the deputy's question regarding the knife, the defendant did not request an admonition that the jury disregard the question, and the circumstances did not require such an admonition by the judge

on his own motion. Pursuant to stipulation, as above indicated, the testimony of Margaret at the prior trial was read at the present trial. The reading included a question as to whether she had made a certain two-page statement to officers at the police station (a part of the statement was that defendant "reached into his pocket and pulled out a knife"). She replied that she did not know. There was evidence to the effect that Williams was not on the bed when he was stabbed (as asserted by defendant) but that he was in the corner by the door and, after rapid movements of defendant's hands, Williams was in a slumped position in the corner. Also, there was evidence that Johnson's nose was cut while he was in the corner struggling with defendant and Williams. In view of the confusion and surprise caused by Johnson's evasive answers as a witness, and in view of the fact that there was a written statement (Exhibit 13) allegedly made by Margaret regarding the knife, and in view of the evidence that the stabbing occurred in the corner, it does not appear that the deputy acted in bad faith in asking the question. The defendant was not denied a fair trial by reason of the asking of the question, or denied a fair trial in any respect. It is not necessary to discuss in detail appellant's other assignments of misconduct on the part of the deputy district attorney. There is no merit to those contentions.

A further contention of appellant is that the evidence was insufficient to support the verdict. The substance of the evidence has been stated hereinabove, and it is not necessary to restate it here. Evidence on behalf of the prosecution was to the effect that defendant assaulted Williams with a knife in the corner near the front door. Evidence on behalf of defendant was to the effect that, in his efforts to defend Margaret against brutality of Williams, he (defendant) was pushed onto the bed by Williams and Johnson, and then Williams, Johnson, and several other persons piled on top of him and beat him, and that in order to defend himself he cut and kicked his way from under the crowd. The jury resolved the conflict in the evidence against defendant. The evidence supports the verdict.

Appellant also asserts that the court erred in permitting Margaret's testimony, given at the preliminary examination, to be read in evidence. His argument is that there was not a sufficient showing of due diligence to obtain her as a witness. There was evidence that two investigators, employed by the district attorney, made extensive searches of public

records, public places, and records of public utilities, and they made many inquiries, in trying to find her. There is no merit to this contention.

 Appellant asserts (in his propria persona brief) that the court erred in receiving in evidence the statement which he made to the officers. His argument is that the rule of the *Dorado* case is applicable herein. On the former appeal it was decided that none of the reasons stated in the *Dorado* case for excluding confessions and admissions was present herein. Furthermore, in the second trial, it was stipulated that there was no objection to the use, at the trial, of the statement made by defendant to officers on April 25, 1963. The court did not err in receiving defendant's statements in evidence.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.